out for you seasoned veterans, which doesn't need pointing out. Do pay attention to our lighting system. If your red light comes on, by all means finish the answering of any question that you are then answering, but don't start a new chain of thought that's not in response to the question. First case of the day, Chamerion, Austin v. City of Pasadena, 22-20341. Looks like Mr. Thomas gets to start us off. Thank you, Your Honor. I might please the court, Bruce Thomas, on behalf of the administrators of the estate of Jamel Shull. This morning I would like to discuss the constitutional and statutory violations that we think we've produced plenty of summary of the Pasadena's own informational, educational materials on the use of tasers that our expert comes from extensively and that we've included at tab 6 of our record excerpts, that's at pages 27-29 of our expert report, which corresponds to the record at 2409-11, if you would like to review those as I'm talking about them. In force cases, we always talk about measured and ascending force, and I'll certainly give the defendants that force was ascending here, it ascended right to deadly force, but there was nothing measured about it, there was nothing proportional about it, there was nothing reasonable about it. And particularly, particularly when it escalates to deadly force. And it's not just me and our experts and rhetorical flourish talking about deadly force because the detainee died here. It's Pasadena's own training materials that advise precisely this sort of event, a cardiac event, a serious injury and death when tasers are used in the manner that the defendants used them here. Our corrections expert, Mr. Defoe, quotes extensively from those materials from the Pasadena Taser Training Academy. And first of all, I would point you to the PFRF guideline 21 at page 27 of the report, where it says, among other things, personnel should consider that exposure to the CEW for longer than 15 seconds, whether due to multiple applications or continuous cycling, may increase the risk of death or serious injury. Then it warns of cardiac exposure, the closer the dart is to the heart, the more likely, the more stress it causes to the heart. It says to reduce cardiac risk when possible, avoid targeting the chest, and also avoid prolonged and continued and repeated exposures. Then again, under avoid extended durations, again emphasizes this, the Department of Justice have set out 15 seconds as a significant safety point. And once again, under tactical considerations and limitations, it warns that officers should consider that an ECW exposure for longer than 15 seconds, whether due to multiple applications or continuous cycling, may increase the risk of death or serious injury. And that is the definition of deadly force, a substantial risk of death or serious bodily harm. And it's so substantial in this case that their training materials warn of it over and over and over. We, in our summary judgment evidence, document 10 taser discharges of 51 seconds cumulatively, including three taser discharges by Whitehead to Jamil Shaw's chest. Let me ask you, my understanding of the record is that two of these officers using tasers had not received the training, is that correct? Well, that's a disputed issue of fact. Let me ask, so maybe it's not for the case yet, but let me ask what that means. It seems to me if the actions to Manel liability, because they were sent forth with tasers without being trained, just do you have any reaction to can you impose liability on individuals using tasers who have been issued them by a police department and they actually haven't been trained on them? Well, they've been trained on them, but they haven't kept their training current. Okay, you said it's a dispute of fact. On both them and the department, I would say. Well, as far as you wish to respond, fine. I was trying to get a more substantial answer from you as to what to make of turning somebody loose with a taser who's not been trained on them. Well, I think it certainly impacts the Manel liability. What the Pasadena is doing, it's saying we don't really care whether you keep up with your training or not. We're going to go ahead and let you continue to carry around tasers and use tasers as you will, even against detainees that are ill in the state of a seizure, regardless of whether we've warned you about that in your training materials. What they're essentially saying is don't worry about the training materials. We're not going to, as an informal matter, we're not really going to enforce that. They have ample evidence. Let me ask you another piece of training. Is it undisputed, not undisputed, genuine dispute of fact that these individuals had been trained on how to deal with epileptic seizures? Merrickman testified that they had received at least some training on epileptic seizures. Your brief says, I think, I may be forgetting the source of it, that a fundamental of handling somebody involved in a seizure is to, I don't know, lift their head up or something like that. Is that part of the training that these individuals received? Is that in the record? It should be. It should be in the record? From two standpoints, both Merrickman's testimony and our expert testimony, that this is common training material that's provided in the corrections setting. What Merrickman says is that, in our deposition, is that they were trained, obviously, never to turn the detainee prone when he's having a seizure and to cushion their head. And then they proceeded to do very much the opposite. They didn't cushion his head. In fact, they bounced it off the floor as they were dragging him along and then let him fall face first directly onto a floor without cushioning his fall. And then they very clearly made considerable effort, up to and including deadly force, to force him into a prone position that was directly contrary to their training. Let me ask you about your Monell claim. Yes. You put it this way in your briefing. You argue that, quote, the city's formal force policies were so vague and general that they amounted to no policy at all that meaningfully restrained an individual officer's use of force, unquote. And so vague and general that it amounted to no policy at all. And my question is, can you identify any precedent from our circuit where we've held that a municipality's lack of a policy, no policy, constitutes a policy or a custom for purposes of Monell? I know there is such authority. I apologize that off the top of my head I can't cite you cases. But I do know that there is authority for the proposition that the lack of a policy when there needs to be a policy constitutes a policy. And I will give you that in a subsequent letter. We document 10 taser discharges, cumulatively 51 seconds, and three of them directly into the chest by defendant Whitehead. And I emphasize that these three by Whitehead are not drive-stun shocks, but these are the initial tasing directly into the chest with the taser barbs and then recycling the taser again and again, putting current directly into Mr. Shaw's chest, which is a significant cardiac risk. Now, those three tasings alone exceed the 15-second threshold or at least meet it because they're each five to six seconds apiece. Now, defendants want to downplay all the drive-stun shocks, saying that, well, we never really made contact because they want to stay close to this 15-second threshold. But again, that's a disputed issue of fact as to how successful they were in inflicting the drive-stun shocks. And, in fact, in the video, it is quite apparent that at times Meriquin in particular is making considerable success with her drive-stun shocks. The trial court notes one at 622.07 where she holds Jamelle's leg with one hand and then takes the taser and drives it into his thigh and clearly makes very good contact and holds it there for several seconds. And in response, Jamelle thrusts his legs up in the air. Now, the lesson the trial court takes from that is the trial court says, well, this is where Jamelle begins kicking more violently. I think the more reasonable lesson that a jury can take from that is he thrusts his legs up more sharply because he's just been tased in the leg. That just makes sense that he's responding to the pain. He's not volitionally trying to kick anybody. He's never trying to volitionally kick anybody because he's in the postictal state of his seizure. And, again, you can see at 622.20, Meriquin makes good contact with his bare side, driving the taser into his side and him reacting to that. So this known secondary risk, which is phrasing this court used in the Pena City of Rio Grande case, the known secondary risk here were of death or serious injury in using a taser in this fashion, and that makes it unreasonable here where there's no allegation that Jamelle engaged in any threat of serious bodily harm to anyone that would warrant deadly force. The only assertion is that allegedly he was resisting them helping him to get medical treatment. In addition to the taser shocks, they hold him prone for three minutes with pressure to his back, which alone is also a potentially deadly force, particularly when you have a vulnerable individual such as Intempa. And here we have a vulnerable individual because he's already been so injured and his breathing so compromised and oxygen to his brain so limited from the repeated excessive taser shocks and the three shocks directly to his chest. So that is deadly force on top of deadly force. So there's more than sufficient evidence here for a jury to conclude that there was not simply excessive force here, but there was excessive deadly force that was completely unreasonable and disproportionate to these circumstances. The training materials also address our argument that it was completely unreasonable to use a taser in drive-stun mode on an individual who's unable to respond volitionally because he's in the grips of a seizure. So it's not just us saying that it's unreasonable. It's in our own training materials. In this same area on the record, 2410, page 28 of Mr. Defoe's report, they are warned that do not use under the heading considerations to avoid CEW excessive force liability. They are warned do not use pain compliance if circumstances dictate that pain is reasonably foreseeably ineffective, such as drug, alcohol, mental illness. Under the grips of a seizure would be exactly that type of category. And then it's even more specific. It says before they attempt what they call volitional compliance with a drive-stun mode, first thing they're supposed to do is verify that the subject is capable of volitional compliance. And, in fact, they have verified just the opposite here. According to Merikman's original statement, Jamel Shaw remains, her words, still incoherent even when they take him out front to the front area after they will him out in the restraint chair. And Whitehead testifies that he understands that the postictal state, that state of confusion continues after the obvious symptoms of a seizure. So they have verified just the opposite, that he's not capable of volitional compliance, yet they use drive-stun anyway. And the reason Merikman uses drive-stun, according to her original statement, is not because she gives it any rational thought. It's because she can't get the taser to work, probably because of her poor training. She tries to shoot him twice with the taser, can't get it to discharge, then casts the cartridge aside and then goes at him in drive-stun mode without any regard to whether that makes any sense. What does the record show with regard to Merikman and Whitehead as to whether or not they had received taser training? Well, the record, their affidavits say we're up to date on all of our taser training, and we went through the taser course and got all the taser training. Our expert testifies that on his review of the record, they had not had their last yearly taser training, which would, under their department guidelines, allow them to carry a taser. So that is the disputed issue. The players, Merikman and Whitehead, were they the individuals that were tasing the? Yes. They were the two jailers that immediately responded, and McCain was their supervisor who came in later, and then Aguirre is the officer who joins the fray and holds him prompt. I see my time is up. All right, counsel. Good morning. May it please the Court, Bill Helfand for the City of Pasadena and the Individual Defendants. Let me start by addressing Judge Southwick and Judge Higginbotham's question regarding training. It is an absolute misstatement to say that any of these individuals were not trained to use the taser. They were trained to use the taser. I think you did clarify that their training wasn't up to date. Well, let me speak to that as well. That's not a matter of paid expertise testimony. That's a matter of documentation. While the appellant hired somebody to say, I don't see it in the records, it's in the records, and the records are in evidence. Let's take it they did receive the training. Did that training teach them that it was permissible to use a laser when someone is having an epileptic seizure? Well, I don't think that the training speaks to that specific judge, but there's no evidence in this case that this gentleman was having an epileptic as opposed to a drug-induced seizure. There's simply no evidence at all. Was it disputed that he was having a seizure? I'm sorry, Your Honor? Put aside the label epileptic. Was there any factual dispute that the man was having a seizure? Well, he was not having a seizure when he was tased. In fact, that's demonstrated by the video, and I appreciate that because that's the other thing I wanted to make clear. The record's very clear that Mr. You tased him and then he went into a seizure. I'm sorry, Judge? You're saying they tased him. Did that cause the seizure? No. Oh, goodness, no. The record shows that Service Officer Marroquin observed a seizure at 6.16 a.m., at which time he called emergency medical services. The seizure ends at 6.18 a.m., that is two minutes later, before any use of a taser. The taser doesn't cause a seizure, and the taser was not used during a seizure. There's a bit of a blur here of what the record shows from the appellant's argument, but the record is quite clear. The seizure concluded at 6.18 a.m. There was no further seizure. What's the marker that the seizure has concluded at 6.18 precisely? Well, he's no longer – He's no longer exhibiting the signs of a seizure that were observed prior to that. How is that recorded at the precise 6.18? Do you use a film? There's a time stamp on the lockup video, which is in the record at 9.53. Let me follow up on that. You look at the film, and you see the advanced taste, and then you don't see then any evidence that he's still in a seizure from the film. Well, actually, if I may, Judge, it's reversed. There's no evidence of a continuation of a seizure. There's open-hand techniques in an effort to subdue Mr. Shaw, who at that time was combative. As the district court observed from the video itself, he was biting and kicking, and the officers were using open-hand techniques in an effort to subdue him. And when that was unsuccessful, they attempted to use the taser. And that's, again, where there's a little bit of a kind of a fast and loose departure from the record here. It is correct to quote the training that says don't use the taser for in excess of 15 seconds. It is correct to point that out, and that multiple taser uses may increase the risk of injury. But that's not the case here. The records demonstrate that the efforts to use the taser were largely unsuccessful, as they often are, as the record shows, in a drive-stunt effort where the individual is combative, because the officer has to make a full contact before deploying the taser. Mr. Elfin, let me ask you about the foundation factually for what you're just saying. A footnote in the district court's summary judgment order says it's unclear from the evidence when exactly Shaw's seizure ends and when his, I never did look up the pronunciation, post-tictal state begins, whether, so fact question, when the seizure ended, when the post-event state begins, whether Shaw is in fact experiencing a series of seizures and the extent of his consciousness at different points. So work with that and the comments that you've already made that the seizure had ended. Well, despite my mother's wishes, I'm not a doctor either. So the answer is what do the officers observe? And Meriquin's testimony is the seizure appeared to end, as we can see on the video, at 6.18 a.m. Now, the district court, absolutely correct to say that no one in that cell knew what was causing the continued apparent combative efforts, which, by the way, was combative efforts that, while Mr. Shaw may not have been aware, were thwarting their efforts, the officers' efforts to obtain medical care. And so to answer your question, Judge Southwick, we look at the conduct and the objective reasonableness when it comes to the use of force in terms of what could the officers have reasonably perceived. And they could be wrong about what they perceived. Saussure v. Katz from the Supreme Court speaks to the fact that immunity is appropriate, whether it's a mistake of fact or a mistake of law. This court in Mendez v. Portovan adopted that, well, restated that in 2016, which is cited at page 15 of the brief. So to answer your question, Your Honor, the question on which this court must focus is what could the officers have reasonably perceived? What they reasonably perceived as they described in their testimony is that these were not the result of a seizure but rather combativeness that they felt they needed to overcome in order to make this gentleman safe for EMS, which is exactly what they did. And, in fact, as to the assertions of excessive force, well, that's been lied by the fact that no force was used once they were actually able to subdue him. What the appellant is positing here is there was a better way to do this, and she's entitled to make that argument, but that's not a constitutional violation. At most, the officers may have misjudged the circumstances, but their responses continued to be consistent with what this court requires, and that is measured and ascending as they attempted to overcome force, and we see that from the fact that the officers used open-hand techniques for some time before resorting to the taser, and when they used the taser, it was not effective because they couldn't in large measure make contact. But as soon as they were able to subdue Mr. Shaw, there was no use of force. So the force here has a purpose, and it has the very purpose that this Court has found repeatedly is authorized under the Constitution. Is it fair to say that the training they received would have indicated that using a taser on the same individual ten times would be too much? Well, that is what the training is consistent. I want to walk through a series of questions for you. So is that what the training would have shown, that ten times on the same suspect within whatever number of minutes this was should not be done? That's excessive? Yes, except please allow me to say that's not the facts here, but yes. I have no doubt. I wasn't necessarily waiting for that. I was aware that was there. But one of the things you said earlier is that it is unclear, or maybe you thought it was clear, how many times there actually was an effective taser on this fellow. But I wonder at the same time if the taser is being used consistently on the individuals, well, the officers themselves know how many times this has been effective. So just to get to ten is an indication they are, without firm assurance that most of these have been ineffective, they're already exceeding their training. Well, except again, that's not what happened here, and also the problem with that hypothetical is they do know whether it's effective. What I said was, I didn't say it was unclear. I think that was my friend. I didn't exactly remember what you said. The record shows that one effective taser event at 622, which the officers observed, and the officers know when the taser is or is not effective because they've been trained to recognize what happens. And what happens is people don't bite and kick as a result of being tased. They fall. They simply go limp. It's a short, high amperage, low voltage electric shock. And so they just go limp. And there's no training that would tell these officers that if somebody continues to fight and kick and try to bite them, that that's the result of a taser. So the officers, and they've testified. Are you saying it is clear from the evidence how many times this fellow was tased? I'm sorry, Judge? Are you saying it is clear on summary judgment how many times this fellow was tased? Well, it depends on what you mean by was tased, Your Honor. There are efforts to use the taser, but most of them were ineffective. And I believe it is clear in the record how I think there's only one effective taser at 622 on the videotape. And that, I think, is consistent with what the officers testified they observed. And, again, the question so, again, that takes us back, though, to Saussure or Portavant, which is the question isn't, well, let me take your question, Judge, and turn it around. An officer who testified, yes, I tased him once, then I tased him a second time, and all the way up to ten, and each of those times I know that this person received the effect of the taser, that would be inconsistent with the training and, with the exception of probably some very unusual facts, probably excessive force. It's not deadly force, by the way, and this Court has never held that the use of a taser is deadly force to my recollection. In fact, the Court has recognized on numerous occasions that the use of a taser is intermediate force. Well, it seems to me it may be some loose language there, but if you're using taser often enough potentially to stop his heart from beating, which I think is some indication that that can happen with enough electric shocks, that could turn into deadly force regardless of what the intent was. I mean, those are not, you say, the facts of this case. But also that's also a little bit afar from the training. The training says it can increase the risk of cardiac arrest, and that comes from the manufacturer. And this is outside the record, but having tried these cases with representatives of the manufacturers testifying, because they often get sued when somebody passes away after the use of a taser as well, they flatly deny the potential for cardiac arrest, except in an individual who has unknown cardiac compromise before. But the training is it increases the risk of cardiac arrest. And I'm not quarreling that there is probably a set of circumstances far afield from those presented here in which one could argue that the taser was used in purpose of deadly force, just like throwing a hair dryer into a puddle that's plugged into the wall would be deadly force, although we wouldn't normally think of that as a deadly weapon. So, yes, we could construct a hypothetical, but that's not the case here. And what the officers, to your question, Judge, they know how effective or, in this case, ineffective the taser efforts were during the event. And so that's what they're trained to observe is not just how many times did one try to use the taser, but how many times was the taser effective. Of course, the other issue here that the appellant hasn't addressed is there's simply no evidence in the record whatsoever of the element of causation here. As the Court knows, one of the elements of a claim under the Fourth or Fourteenth Amendment for excessive force is not only that the force was excessive, but that it caused injury. Cardiac arrest is 657 when you load it into the van, according to the record, I think. And that's about just a minute's time span. So proximity itself is of an underlying basis of causation. The question is a question of fact at that point. The problem I have is how do we determine that? Absolutely, it could be argued one way or the other. That may give you Monell liability, but I'm not sure that it would escape Monell liability. But that doesn't answer the question as to the individual. But that's inconsistent, Your Honor, with this Court's and the Supreme Court's Rule 56 precedent on summary judgment. We would never – I don't think this Court would have – No, I'm speaking in terms of qualified immunity, the genuine issues of material fact that must be resolved. But the underlying basis of qualified immunity is that – and its provision of immunity is that it should be determined at – it should be decided at the earliest time that it can be determined. That's inherent in the quality of immunity. That's why the timeline here backs into the question of causation. It is the element of causation in many ways. The sequence of events. Well, I certainly would understand that if we were here on a 12B6 dismissal, but we're not. That's why I was saying that we're on a summary judgment record. And this Court and the Supreme Court, consistent with the very express terms of the rules, makes clear that when the defendants move for summary judgment and said, among other things, there is no evidence of a causal link between anything that these individuals did and this gentleman's cardiac arrest. And let me pause for a second and say, again, while I'm not a doctor, most doctors testify that we all eventually pass away from cardiac arrest. So we don't know anything about the fact that there was a cardiac arrest. I understand. I'm not focused on the B6 aspect. It was on summary judgment. But that's the question about issues of fact. That's really where this thing spins. And I apologize for my ineloquence. There is no question of fact on whether this man died from anything that these individuals did because there's no evidence in the record that raises that fact. It's just an allegation. And I think it's Rule 56C that says you can't stand on your allegations in response to a motion for summary judgment. I understand. But it boils down to the question of the timing and the sequence of events. I thought we would look at this. They put him on something. They loaded him. He was immediately in cardiac arrest. It wasn't the next day he died, but he was in cardiac arrest almost immediately. But we also know that he was intoxicated on some unknown drug. And so we don't know when the – They gave him Versed. I'm sorry, Judge? They gave him a tranquilizer. They also gave him a tranquilizer, which, by the way, I would respectfully submit. I'll come back to the Versed in a second, but thank you for reminding me of that, Judge. But to answer your question, we know he was arrested because of drug intoxication, intoxication other than alcohol. So we don't know. And the appellant never addressed their burden on summary judgment to explain whether that was the cause of the cardiac arrest. But merely the fact that he was arrested was the subject of some force that was used and then had a cardiac arrest does not tell us that those things are related. That's coincidence, not causation. And Rule 56 required evidence of causation. But I do appreciate your point about the Versed, Your Honor, because, again, the Versed wasn't medically necessary for a seizure. The Versed was necessary, according to the EMS personnel, to calm Mr. Shaw down, the same thing that the officers were attempting to do, both starting with open-hand techniques and then ultimately with the use of the taser. Let me ask you about two of the points you've made here, both the number of times there's been effective tasing of the individual and there's no causation shown. Did the district judge make any rulings as to either of those? I don't believe that he did. I was looking through the opinion, so basically you're back to the argument you're probably making in summary judgment to the district judge, and the district judge never got to those points. I don't believe the judge reached those questions. But, of course, this Court would affirm on grounds on which the Court could have granted summary judgment, but the district judge may not have reached. I just want to make clear, he did not grant summary judgment on either one of the two points you just made about number of tasers not being excessive or – he did ultimately say it was not excessive force, but he did not make any finding about what the evidence showed either on causation or on the number of tasings. That is my recollection of the Court's summary judgment opinion. I would submit, if Your Honor will allow, that the judge made an implicit determination that the amount of use of the taser was not excessive to make an explicit finding that there was not excessive force. Implications can be in the eye of the reader, I suppose. Thank you, Judge. In the little time that I have left, let me answer Judge Willett's question. The answer to the question you posed to my friend as to whether this Court has ever held that no policy at all constitutes policy for purposes of Monell is no. I think that the case of – I believe it's Campbell v. the City of San Antonio comes to mind, and for some reason I think it's cited 910 F. 2nd something, and that's a case in which this – and if that's the case, there is a case, and I'm happy to brief if the Court would like, in which it was a training case in which the Court said something to the effect of But in other words – and that's really – and this – the trial court did observe – is I think it's – we hear the same argument all the time. It's as if you had no policy. But, of course, there are clear written policies, and officers are expected to observe them. We've seen situations where you have a policymaker who has – who fails to act, et cetera, and his failure to act then becomes that. So you start there with the basis that there is a person – a position to create, but the absence of it is where we are. Yes, and Your Honor is absolutely correct. This Court addressed that en banc in Bennett v. City of Slidell in addressing the entire policymaking question and pointed out that where there are – where there's evidence of repeated violations of which the policymaker is aware and then the policymaker refuses to act despite the fact that they know that there's a potential for constitutional harm, that can be attributed to the policymaker for Monell liability. But this Court has always said that requires evidence of repeated violations and evidence that has come to the attention of the policymaker for what this Court has called the attribution principle, which is not in this case at all. If I could just finish by saying, in answer to Judge Willett's question, obviously just as a matter of logic as opposed to not just law, an individual doesn't rely on insufficient policies to move them to do something, and that's certainly the case here. Thank you for your time. Thank you. Let me address a few points. Some is terminology. The postictal state of a seizure is commonly referred to as the last stage of a seizure. That's the state of altered mental confusion, altered state of reality. The ictal state is the ongoing symptoms where you're foaming at the mouth and convulsing. The preictal state, commonly called the aura, is when it's coming on. So Jamelle Shaw here was very much in the postictal state of the seizure when they began using tasers against him, and they were aware of the postictal state and they observed the postictal state, using the term remained incoherent. When they began going hands-on with him, he was still convulsing and foaming at the mouth at the time. You can see when they initially go hands-on, he bows up and he appears to be heaving at the ground, and the postictal state followed immediately after that. So it's not accurate that the seizure had ended. In effect, in their original statements, the defendants never claimed to have ever thought that the seizure ended. They added that for purposes of litigation, and a jury can determine that that's post hoc rationalization, that in fact these defendants never believed that the seizure was over because they never said that in their original statements, and the original statements were not prepared in haste. They were prepared with the assistance of an attorney over the course of two to four weeks after the events occurred, and if they didn't say at that time that they didn't think the seizure had ended, it's hard to believe that years later in litigation that that's what they believed at the time. The initial instruction that they made, what they call instruction that they made to Jamel, upon entering the cell, after they moved the people out, they went up to him and they say they observed him convulsing and foaming at the mouth, and then gave him the instruction to calm down and breathe, and he refused to comply. Well, that's going back to characterizing everything he does as volitional when they know in fact it's not volitional. I don't know what that's supposed to mean. How is a person foaming at the mouth and convulsing supposed to comply with the instruction, calm down and keep breathing? It's just an instruction to stop being sick. It's an absurd instruction, just like it was in the City of Rainbow case that we discussed in our reply, where the officer tells the person that's in the grips of the seizure, if you don't calm down, I'm going to tase you. Well, that's just telling them to stop being sick, and you can't do that. Two of the tasings. Two evidentiary points I've discussed. What is the evidence that you would say creates at least a dispute of fact as to causation, and what is the evidence that might create a dispute of fact of how many times he was effectively tased? The first is not only the temporal timing. I agree with Judge Higginbotham's point on that. But also we submitted expert medical testimony on it. That's our major evidence on it. Dr. Amalu's report and opinion that it was the tasings that caused electric asphyxiation and deprived his brain of oxygen, and that caused a heart attack along with a mechanical asphyxiation. So that's obvious causation evidence. Now, on the tasings, the taser printout shows how many times it was discharged, 10 times 51 seconds cumulatively. And then our controverting evidence to their remissed evidence is what our expert reports, our corrections expert from his review, and the video itself, including those parts that I pointed out earlier where you can see the taser making very good contact with his thigh and his side. Did an expert say there were at least X number of tasings? He said there were 10 tasings. Right, we know that. But as far as effective, it actually struck the deceased and actually had some impact on him. Was there any number given for that? I don't think he gave a number other than his narrative report after each one when he makes comments about Shaw's reaction to it. All right, counsel. I took up some of your questions. I'll give you another minute if you had some. Well, I wanted to add. I appreciate it. The reason that this is an ADA case as well as a 1983 case is because of this volitional point. Although they recognize that he cannot respond volitionally, he's incapable of responding volitionally, they treat him as if he can. They say they keep giving commands and then use force against him because he doesn't respond to those commands. He refuses to respond to those commands even though they know that he can't. And that's both unreasonable and discriminatory because you're inflicting pain against him and treating him as if he has no disability when they know he does have a disability. Thank you. All right, counsel. Thank you. Thank you both for helping us understand this case.